U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 SEP 26 PM 1:07

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:13-cr-28 |
| ) | |
| DEVON CHIN ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**
(Doc. 15)

This matter came before the court on June 26, 2013 for an evidentiary hearing on Defendant Devon Chin's motion to suppress physical evidence and statements. (Doc. 15.) The parties completed post-hearing briefing on August 29, 2013 at which point the court took the matter under advisement.

Defendant is charged in a one count indictment with knowingly and intentionally possessing, with intent to distribute, heroin in violation of 21 U.S.C. § 841(a)(1). Defendant seeks suppression of physical evidence discovered after police seized and searched Defendant's backpack during a stop of a vehicle in which Defendant was a passenger. Defendant argues that there was no lawful basis for stopping the vehicle, no basis to extend the stop and use a drug-sniffing canine, and no probable cause to search the backpack once the drug-sniffing canine alerted to the backpack. The government opposes the motion, arguing that the vehicle was properly stopped for a motor vehicle violation, police officers did not impermissibly prolong the traffic stop, and the drug-sniffing canine's alert provided probable cause to seize the backpack and apply for a search warrant.

Defendant also seeks to suppress statements he made at the stop regarding ownership of the backpack, arguing that his statements were the result of custodial interrogation without the benefit of *Miranda* warnings. The government opposes the motion, arguing that Defendant was not in custody at the time he made the statements.

The government is represented by Assistant United States Attorney Michael P. Drescher. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

I. **Findings of Fact.**

On February 24, 2013, South Burlington Police Officer Michael DeFiore was parked in a police cruiser outside the Megabus station in Burlington, Vermont conducting surveillance. Officer DeFiore was aware that individuals bringing narcotics to Vermont from New York City often used the Megabus as a mode of transportation. At approximately 1:19 a.m., he observed Joshua Carmichael drive to the Megabus station in a silver Volkswagen GTI and pick up two individuals who had arrived on the Megabus. Officer DeFiore recognized Mr. Carmichael and his vehicle from a previous arrest for driving under the influence. During that arrest, Mr. Carmichael stated that he used heroin. Officer DeFiore was also present after Mr. Carmichael called the police to a dwelling where a friend of his had overdosed. Several days prior to the day in question, Officer DeFiore had received an email alerting him that Mr. Carmichael was currently using his silver Volkswagen Golf to provide driving services for an "unknown overweight black female" who was "bringing hundreds of bags of heroin to [Vermont] weekly" from New York City. (Doc. 24 at 1.) The email advised law enforcement to find probable cause and stop Mr. Carmichael's car whenever possible.[1]

After Mr. Carmichael drove away from the Megabus station, Officer DeFiore followed him in his police cruiser.[2] Officer DeFiore was accompanied by an officer from the University of Vermont ("UVM") Police Services. Before stopping Mr. Carmichael's

---

[1] Officer DeFiore inaccurately testified that the email stated "that Joshua Carmichael had been transporting persons from New York City up and down the Williston Road corridor to deal drugs." (Tr. 06/26/13 at 86.)

[2] Officer DeFiore recorded his pursuit and stop of the Carmichael vehicle with his cruiser's video camera. This recording was admitted at the court's hearing as Exhibit 1. Post-hearing, the government submitted a transcript of the video recording after Defendant had reviewed it for accuracy.

2

vehicle, Officer DeFiore called dispatch, asking that the Burlington police department "get their canine headn' this way it'll be Joshua Carmichael." (Doc. 22-1 at 1.) Thereafter at approximately 1:20 a.m., Officer DeFiore stopped Mr. Carmichael's vehicle on East Avenue in Burlington, purportedly because he observed a banner-type item approximately three inches in length and four inches in width hanging from Mr. Carmichael's rear view mirror.

Officer DeFiore walked up to the driver's side window and, after exchanging greetings with Mr. Carmichael, asked Mr. Carmichael if he knew why he was being pulled over. Mr. Carmichael said he did not know, but asked if the stop was due to a report of the vehicle being stolen. Officer DeFiore replied that the stop was due to "the stuff hangin' in your rear [] view mirror." *Id.* Mr. Carmichael responded, "Want me to take it off?" *Id.* Officer DeFiore said "yeah," *id.*, although he did not cite Mr. Carmichael for the alleged motor vehicle violation. When asked where he was heading, Mr. Carmichael explained that he was "droppin' these guys off at their house." *Id.* at 2. Officer DeFiore asked for identification from each of the vehicle's occupants and radioed for another officer to assist in the traffic stop.

Both Defendant and the other passenger denied having any photo identification with them. Defendant stated that his name was "Eric Cooper" and gave his date of birth as "October 23, 1992." He stated that he did not have a license but had been issued a New York state I.D. The other passenger, later confirmed to be Rason Battle, stated that his name was "Chad Hollingsworth." Officer DeFiore asked Mr. Carmichael how the individual who had overdosed was doing. During this exchange, Officer DeFiore observed a small plastic bag that he suspected was a container for narcotics, as well as a vial of sterile water that he believed to be "used as a mixing agent to inject drugs." (Tr. 06/26/13 at 23.) Officer DeFiore returned to his vehicle at approximately 1:24 a.m., advising Mr. Carmichael, Defendant, and Mr. Battle to "just hang out in the car." (Doc. 22-1 at 6.)

After returning to his cruiser, Officer DeFiore informed the other officers that he suspected that the occupants of the vehicle were "carrying heavy," *id.*, meaning he

3

"suspected they had narcotics." (Tr. 06/26/13 at 23.) Officer DeFiore described Mr. Carmichael as a "known heroin courier [who] drives people all around, all around, all the time" and advised the officers to stop Mr. Carmichael's vehicle "anytime you see [it]." (Doc. 22-1 at 6-7.) He also informed the officers that he called in a canine unit and that he was "going to run the dog around." *Id.* at 6. He attempted to check the passengers' identities with dispatch, which responded that Chad Hollingsworth had a valid New York address, but Eric Cooper with a date of birth of October 23, 1992 did not appear in any New York records.

At approximately 1:27 a.m., Officer DeFiore returned to Mr. Carmichael's vehicle again and requested Mr. Carmichael's proof of insurance and registration. As Mr. Carmichael was searching for the documents, Officer DeFiore asked Mr. Carmichael about the small plastic bag and vile of water that he had observed earlier. Mr. Carmichael stated "that's just water," and Officer DeFiore responded "I know. I know what it's for too." *Id.* at 9. Mr. Carmichael then handed the bag and water to Officer DeFiore. Officer DeFiore asked if there were drugs in the vehicle and Mr. Carmichael responded that there were not.

At approximately 1:28 a.m., Burlington Police Corporal Trent Martin, a certified canine handler, arrived with his drug-sniffing canine Capone. Officer DeFiore instructed Mr. Carmichael to continue searching for his insurance and registration. He then approached Corporal Martin and told him that he believed there were narcotics in the vehicle, and that he was going to attempt to obtain consent for Capone to sniff inside the vehicle. After speaking with Corporal Martin, Officer DeFiore returned to the vehicle and asked Mr. Carmichael: "Hey, Josh, you want to step out of the car for me and shut it off? Step back here with me." *Id.* at 11. Officer DeFiore told the passengers: "You guys can stay in the car for right now." *Id.* Thereafter, Officer DeFiore obtained Mr. Carmichael's verbal consent to search the car.

At approximately 1:31 a.m., Officer DeFiore informed the other officers that Mr. Carmichael was going to consent to search the vehicle, and that Officer DeFiore believed there was probable cause to search the vehicle due to the bag and water he found inside.

The officers agreed that Officer DeFiore would explain a written consent form to Mr. Carmichael while Corporal Martin circled the vehicle with Capone. At approximately 1:34 a.m., Corporal Martin informed Officer DeFiore that Capone alerted to the presence of narcotics. Officer DeFiore informed Mr. Carmichael of the alert and asked Mr. Carmichael to empty his pockets. He read the written consent form to Mr. Carmichael and, at approximately 1:37 a.m., Mr. Carmichael signed it.

Prior to Capone's sniff of the interior of Mr. Carmichael's vehicle, Officer DeFiore ordered the passengers to exit the vehicle. After Mr. Battle exited the vehicle, Officer DeFiore told Defendant to exit the vehicle, telling him to "relax" and "chill out," *id.* at 20, reportedly to "ease the tension" of the traffic stop. (Tr. 06/26/13 at 53.) As Defendant exited the vehicle, Officer DeFiore told him to take his hands out of his pockets and advised him that "[t]he dog hit on the car." (Doc. 22-1 at 21.) He asked whether there was anything in the car the officer should know about and whether Defendant was "holding anything." *Id.* Defendant said "nah." *Id.* Officer DeFiore responded: "You lying to me?" *Id.* To which Defendant responded "I'm sure." *Id.* Officer DeFiore then told Defendant he was going to pat him down for weapons and asked whether Defendant was carrying any weapons or needles. Defendant replied "no." *Id.* Officer DeFiore then directed Defendant to place his hands on the cruiser and patted him down. Defendant consented to Officer DeFiore reaching into his pockets and removing their contents. Officer DeFiore asked whether Defendant had any "weed" and said: "It's Vermont man and if you got weed on you, you can be real with me, I don't care." *Id.* at 22-23. Defendant laughed in response. After the patdown, Officer DeFiore returned Defendant's personal belongings to him, including his cell phone, and stated: "Alright man, you can go hangout over there with Officer Williamson." *Id.* at 23. After this brief exchange, lasting approximately two-and-a-half minutes, the other officers searched the inside of the vehicle.

Capone alerted to a backpack in the back seat of the vehicle. In the vehicle's interior, Officer DeFiore observed a tin cup, cotton balls, needles, distilled water, and a wax paper fold, which he suspected were drug paraphernalia. Officer DeFiore took the

5

backpack out of the vehicle and asked the vehicle's occupants: "Whose bag is this?" *Id.* at 31. Defendant responded: "That's mine." *Id.* At the time, Defendant was standing approximately five feet from Officer DeFiore, and two uniformed police officers were standing beside Defendant. Officer DeFiore asked whether Defendant would consent to a search of the backpack. Defendant declined consent. Officer DeFiore informed Defendant that Capone had alerted to the backpack and that they would seize it and apply for a search warrant. He stated to Defendant: "so here's the deal, okay . . . [t]his is your black backpack." *Id.* at 32. Defendant agreed that it was. Officer DeFiore again sought to obtain Defendant's consent to search the backpack and Defendant again declined to grant it. Shortly thereafter, the officers decided to transport Defendant to the police station for a fingerprint identification. Officer DeFiore asked his fellow officers: "Do we have enough to take him back and do a fingerprint ID on him?" *Id.* at 38. The officers agreed that this was permissible and Defendant should be cuffed because "it's custodial." *Id.* at 40.

During the stop, the officers did not display their weapons or place any of the vehicle's occupants in handcuffs or other physical restraints. The traffic stop was on a public highway exposed to passersby, including a college student who attempted to engage with the officers as he walked by. The officers did not raise voices or verbally or physically threaten Defendant or any of the vehicle's occupants. Because the officers were unable to confirm the identity of Defendant as "Eric Cooper," and suspected Defendant of giving them a false name,[3] they arrested Defendant and transported him to the South Burlington Police Station for fingerprinting, after which they released him.[4] Approximately an hour later, the results of the fingerprints came back indicating Defendant's true identity.

On February 25, 2013, Officer DeFiore applied for a search warrant to search Defendant's backpack. The application included his affidavit in which he described the

---

[3] Vermont criminalizes the providing of false information to a police officer in the course of an investigation. 13 V.S.A. § 1754.

[4] Defendant does not challenge his arrest and therefore the court does not address it further.

6

circumstances of the stop and search of the vehicle, as well as the fingerprinting of Defendant and his criminal history. The affidavit inaccurately recited that Officer DeFiore requested the canine unit after effecting the traffic stop and after observing the alleged drug paraphernalia. The application also included an affidavit from Corporal Martin relating to the use of Capone:

> K9 Capone is a certified drug detection canine. On April 11, 2008 K9 Capone graduated from the Basic Canine Drug Detection School, sponsored by the Vermont Police Academy. K9 Capone successfully completed the six-week program and has been so certified by the Vermont Criminal Justice Training Council. K9 Capone is certified to detect the presence of marijuana, hashish, cocaine, crack, heroin, ecstasy, methamphetamine, and various forms of used drug paraphernalia. In addition, K9 Capone had been trained to detect the above-mentioned illicit drugs while contained in various packaging, and is further able to detect monies tainted/contaminated with one or more of these illicit drugs.
>
> . . . .
>
> K9 Capone attends required training (every month) at the Vermont Police Academy or a designated si[te], taught by a certified drug detection trainer or his designee. This training usually requires 6-7 hours of training with approximately 15-22 good quality searches of the above-named drugs hidden in different locations. K9 Capone is required to re-certify once a year in front of at least two certified canine drug detection instructors.

(Exhibit 2 at 5; Doc. 15-1 at 5.) A search warrant for the backpack was subsequently issued. Law enforcement discovered heroin in the backpack, which forms the basis of the pending charge against Defendant.

## II. Conclusions of Law and Analysis.

### A. Whether the Traffic Stop Was Based Upon a Reasonable Suspicion of Criminal Activity.

Defendant moves to suppress on the basis that the initial stop of Mr. Carmichael's vehicle was unlawful as it was pretextual and not supported by a reasonable suspicion of criminal activity.[5] The United States Supreme Court has recognized that a passenger has

---

[5] Defendant initially challenged the stop, contending that it "violated the Fourth Amendment because it was not based on probable cause. Officer DeFiore did not have sufficient basis to believe that any objects hanging from the re[ar]view mirror in fact obstructed the driver's vision out of the windshield." (Doc. 15 at 3.) He also argued that the stop "was blatantly pre-textual in that the true purpose of the officer was to search the car for drugs." *Id.* In his post-hearing

standing to challenge the constitutionality of a stop of the vehicle in which he or she is traveling. *See Arizona v. Johnson*, 555 U.S. 323, 332 (2009) ("[A] passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.' A passenger therefore has standing to challenge a stop's constitutionality.") (quoting *Brendlin v. California*, 551 U.S. 249, 258 (2007)). Defendant argues that the stop of Mr. Carmichael's vehicle was unlawful because hanging an object from a rear view mirror is not a violation of 23 V.S.A. § 1125. The government disagrees, and argues that the stop was justified because Officer DeFiore had reasonable suspicion that a violation of section 1125 had occurred.

Section 1125 is entitled "Obstructing windshields." In relevant part it provides:

(a) No person shall paste, stick, or paint advertising matter or other things on or over any transparent part of a motor vehicle windshield, vent windows, or side windows located immediately to the left and right of the operator, *nor hang any object, other than a rear view mirror, in back of the windshield* except as follows:

(1) in a space not over four inches high and 12 inches long in the lower right-hand corner of the windshield;

(2) in such space as the commissioner of motor vehicles may specify for location of any sticker required by governmental regulation;

(3) in a space not over two inches high and two and one-half inches long in the upper left-hand corner of the windshield . . . .

23 V.S.A. § 1125 (emphasis supplied).

Vermont's trial courts have reached divergent conclusions regarding the proper interpretation of 23 V.S.A. § 1125 because the statute does not directly address objects hanging from a rear view mirror and does not generally criminalize obstruction of

---

memorandum, Defendant reformulates his challenge to claim the traffic stop was unsupported by a reasonable suspicion of criminal activity because there was no motor vehicle violation and extends his argument that the stop was "blatantly pretextual" to a claim that the officer was motivated by a desire to search not only the vehicle, but the passengers as well. (Doc. 23 at 6.)

windshield,[6] but instead only identifies those objects that can and cannot be placed on the back of a windshield. *Compare State v. Soucy*, No. 309-1-13 Cncr, at *4 (Vt. Super. Ct. Mar. 14, 2013) ("The plain language of the statute does not prohibit the hanging of an object from the rear view mirror" and rule of lenity and strict construction of criminal statutes favor a narrow interpretation); *State v. Williams*, No. 4631-11-12 Cncr, at *3 & n.2 (Vt. Super. Ct. June 13, 2013) ("The plain meaning interpretation of section 1125 does not prohibit the hanging of an object from the mirror" and "[a] motor vehicle stop initiated by reason of an object handing from the rear [] view mirror is clearly pretextual and is particularly problematic"); *with State v. Barcelos*, No. 718-7-12 Bncr, at *2 (Vt. Super. Ct. Oct. 2, 2012) (holding section 1125 is not void for vagueness and concluding that hanging an air freshener from a rear view mirror violates 23 V.S.A. § 1125 and "[t]he fact that one could argue that a sun visor violates the strict language of the statute does not change the results[ ]" because "[i]t would be unreasonable to fear prosecution under this statute for driving with the sun visor down"); *and State v. McPhee*, No. 519-3-10 Rdcr, at *3 (Vt. Super. Ct. June 21, 2010) ("According to the plain language of § 1125, hanging a necklace from the windshield of a vehicle is a violation . . . it is clear that hanging a necklace from the rear view mirror is also a violation" as such an interpretation is required to avoid an absurd result and noting that "the statute does not require that a hanging object, in fact, obstruct the windshield").

Were this court called upon to interpret 23 V.S.A. § 1125, "[u]nder a long line of [Supreme Court] decisions, the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). As the Supreme Court has explained:

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule not only

---

[6] The Vermont trial courts also differ as to the import accorded to the title of section 1125. *See Cardiff v. Ellinwood*, 2007 VT 88, ¶ 12, 182 Vt. 602 (in statutory interpretation, a court may not "afford the title of a statute more authority than the words of the statute itself"); *Carter v. United States*, 530 U.S. 255, 267 (2000) (holding that "the title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself" and refusing to import extra elements into the offense based on the term "robbery" appearing in the title) (internal quotation marks and alterations omitted)).

9

vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce [the legislative branch] to speak more clearly and keeps courts from making criminal law in [the legislature's] stead.

*Id.* (citations omitted); *Sash v. Zenk*, 439 F.3d 61, 64 (2d Cir. 2006) (explaining that "the rule of lenity tips the scales in favor of the defendant"); *see also Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (holding state criminal statute "unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute"). However, this court need not reach that issue because, under federal law, a law enforcement officer's objectively reasonable reliance upon a statute that appears to criminalize the conduct in question will suffice. *See Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (holding that under the good faith exception to the exclusionary rule, evidence obtained by an officer acting in objectively reasonable reliance on a statute will be admitted unless the statute was "clearly unconstitutional" at the time that the officer obtained the evidence). As a result, "[t]he determinative question is not whether [Mr. Carmichael] actually violated the Motor Vehicle Code . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that [he] was committing a code violation." *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005).

In this case, Officer DeFiore stopped Mr. Carmichael's vehicle based, in part, upon a belief that the banner attached to Mr. Carmichael's rear view mirror violated 23 V.S.A. § 1125. The Vermont Supreme Court has not ruled section 1125 unconstitutional and the Vermont trial courts' efforts to grapple with its proper interpretation supports a conclusion that Officer DeFiore's interpretation of it was objectively reasonable. The fact that the stop was an otherwise pretextual effort to search Mr. Carmichael's vehicle and passengers for illegal drugs does not alter the analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting claim that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). "In

other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1999). Because Officer DeFiore held an objectively reasonable suspicion that Mr. Carmichael was violating Vermont's motor vehicle code, his stop of Defendant's vehicle on this basis was lawful under *Terry v. Ohio*, 392 U.S. 1, 28-29 (1968) (holding that law enforcement may detain an individual upon a "reasonable belief" that the individual is committing a crime). Defendant's motion to suppress on the basis of the initial roadside stop must therefore be DENIED.

### B. Whether the Officers Unreasonably Expanded the Legitimate Scope of the Traffic Stop.

Defendant next contends that the officers impermissibly prolonged the vehicle stop by asking "extraneous" questions and waiting for the canine unit to arrive. (Doc. 15 at 4.) A seizure that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). As applied to a traffic stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Nevertheless, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. Likewise, use of a narcotics canine "during a lawful traffic stop, generally does not implicate" the Fourth Amendment as long as the officers do not measurably extend the stop. *Caballes*, 543 U.S. at 409.

In *United States v. Harrison*, the Second Circuit held that questioning lasting five to six minutes between a traffic stop and an arrest "did not prolong the stop so as to render it unconstitutional." *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010). *Harrison* cites approvingly to cases where "[l]onger intervals . . . have been deemed tolerable." *Id.* (citing *United States v. Turvin*, 517 F.3d 1097, 1103-04 (9th Cir. 2008) (holding that a fourteen minute period of questioning was not unlawful because "officers

11

do not need reasonable suspicion to ask questions unrelated to the purpose of an initially lawful stop [where the questioning] did not unreasonably prolong the duration of the stop"); *United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short . . . . Even *if* seventeen minutes is some minutes longer than the norm, we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself.")).

Here, the canine unit arrived within approximately eight minutes of the stop, while Mr. Carmichael was still searching for his insurance and registration. At the time, Officer DeFiore had not yet advised Mr. Carmichael that he would only be issuing him a verbal warning. (Doc. 22-1 at 35.) The officers therefore did not unreasonably prolong the stop to wait for the canine unit. *Cf. United States v. Ramos*, 2012 WL 1854747, at *16 (D. Vt. May 21, 2012) (holding a detention was unconstitutional where the "canine unit did not arrive within the time necessary to satisfy the purpose of the initial stop"). Approximately three minutes later, Mr. Carmichael verbally consented to the vehicle search. At this point, the officers could constitutionally extend the traffic stop to conduct the consensual search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("[A] search authorized by consent is wholly valid."). Capone alerted to the vehicle three minutes later, providing independent justification to prolong the search. *See United States v. Waltzer*, 682 F.2d 370, 372 (2d Cir. 1982) ("We regard the dog's designation of the luggage as itself establishing probable cause, enough for the arrest, more than enough for the stop."). Any extraneous questioning that occurred during the eleven minutes that elapsed between the traffic stop and Mr. Carmichael's consent to the search thus did not unreasonably prolong the traffic stop and did not give rise to a Fourth Amendment violation. Defendant's motion to suppress on this basis must therefore be DENIED.

### C. Whether the Drug-Sniffing Canine's "Alert" to Defendant's Backpack Provided Probable Cause to Search the Backpack.

Defendant also challenges the seizure of his backpack, arguing that there was no probable cause to search it. The Second Circuit has held that "[t]he Government bears the burden of proof as to establishing probable cause" in a motion to suppress. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). Unlike the common areas of a vehicle, a passenger has a reasonable expectation of privacy in his private luggage. *See Bond v. United States*, 529 U.S. 334, 338-39 (2000) (holding that a bus passenger who has placed a duffel bag in an overhead compartment "does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner," and that the passenger's expectation of privacy in the bag is "one that society is prepared to recognize as reasonable") (internal quotation marks omitted); *United States v. Sparks*, 287 Fed. App'x. 918, 920 (2d Cir. 2008) ("[P]assengers may . . . retain an actual, reasonable, socially recognized expectation of privacy in their luggage, even when it is transported in a vehicle driven by or shared with others").

The Supreme Court recently held that a canine sniff of a vehicle during a traffic stop does not constitute a search under the Fourth Amendment. *Florida v. Harris*, 133 S. Ct. 1050, 1054 (2013). The Court has also held that a canine sniff of luggage in an airport does not constitute a search. *United States v. Place*, 462 U.S. 696, 707 (1983); *see also United States v. Hayes*, 551 F.3d 138, 144 (2d Cir. 2008) (holding that a canine sniff of a bag in the bushes outside of a home is also not a search). Thus, Capone's sniff of the backpack itself, which resulted in an alert, was not a search. Defendant nevertheless challenges Capone's alert as the basis for probable cause to search the backpack, contending that the government has failed to provide sufficient evidence of Capone's reliability.

In *Florida v. Harris*, the Court held that requiring "records of a dog's field performance" for a finding of probable cause was reversible error because "in most cases they have relatively limited import." *Harris*, 133 S. Ct. at 1056. The Court explained that "[t]he better measure of a dog's reliability . . . comes away from the field, in

13

controlled testing environments" such as "standard training and certification settings." *Id.* at 1057. Accordingly,

> . . . evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Id.* The Court explained the proper procedure for determining probable cause as follows:

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant . . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.
>
> In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe . . . an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

*Id.* at 1057-58.

Here, Capone was certified as a drug detection canine in 2008. Since certification, Capone participated in monthly training sessions, consisting of approximately six to seven hours of training per session. During this training, he completed multiple searches for the contraband that he is trained to detect. Capone is recertified on a yearly basis by at least two instructors. This evidence, which is uncontested, is sufficient to establish probable cause. *See id.* at 1058 ("If the [government] has produced proof from controlled settings that a dog preforms reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause."). If Defendant obtains additional information through discovery that places Capone's reliability in doubt,[7] he may petition the court to supplement his motion to suppress. Defendant's motion to suppress on the basis of lack of probable cause for the search warrant is therefore DENIED.

### D. Whether Defendant's Statements Were the Product of Custodial Interrogation Without the Benefit of *Miranda* Warnings.

Finally, Defendant moves to suppress his statements claiming ownership of the backpack, contending they were the product of custodial interrogation without *Miranda* warnings. The government counters Defendant was not in custody at the time.

A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation. *See United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) (holding defendant "had the burden of proving that he was under arrest or in custody" when seeking suppression of statements); *United States v. Cunningham*, 2012 WL 369923, at *3 (D. Vt. Feb. 3, 2012) (same); *United States v. Sciolino*, 2009 WL 2914570, at *3 (E.D. Cal. Sept. 9, 2009) ("The Fifth Circuit, Eighth Circuit, and numerous district courts have also explicitly held that a defendant bears the burden of proving he was in custody at the time incriminating statements were made.") (collecting cases)).

---

[7] The government has provided Defendant with Capone's certification and training records.

The Supreme Court has held that "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding no custody where the defendant was ordered out of the vehicle, questioned, and requested to perform a roadside sobriety test). "[D]uring a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Brendlin*, 551 U.S. at 258. Moreover, "officers who conduct 'routine traffic stop[s]' may 'perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.'" *Johnson*, 555 U.S. at 332 (alteration in original) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998)). However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

The test for "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). A court should "begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). "On the other hand, if a reasonable person would not have thought himself free to leave," the "court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* "Only if the answer to this second question is yes was the person 'in custody . . . .'" *Id.* (quoting *Berkemer*, 468 U.S. at 440). A court must "'examine all of the circumstances surrounding the interrogation.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 324 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially

16

whether they were drawn; whether officers told the suspect he was free to leave or under suspicion . . . . The circumstances also include . . . the nature of the questions asked.

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (citations omitted).

In this case, Defendant was subjected to a traffic stop late in the evening, which eventually involved four armed law enforcement officers in uniform. Officer DeFiore initially told Defendant to remain in the vehicle while he spoke with Mr. Carmichael outside the vehicle. Thereafter, Defendant was directed to exit the vehicle, frisked for weapons and contraband,[8] his pockets were emptied, and he was told to go stand on the sidewalk with two uniformed officers while other officers and Capone searched the inside of Mr. Carmichael's vehicle. The officers did not advise Defendant that he was not under arrest or free to leave, and in fact Defendant was arrested at the conclusion of the traffic stop. Because Officer DeFiore was clearly issuing orders to Defendant, a reasonable person in Defendant's circumstances would not feel free to ignore those directions and walk away.

However, even if person is not actually free to leave, he or she may not be in custody for purposes of *Miranda*. *See Berkemer*, 468 U.S. at 440 (holding that "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*"). "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' [himself] to be 'subjected to restraints comparable to those associated with a formal arrest.'" *FNU LNU*, 653 F.3d at 153 (first alteration in original) (quoting *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009)); *Newton*, 369 F.3d at 671. In contending that he was subject to a de facto arrest, Defendant relies heavily on a decision from the Northern District of Indiana in which the court suppressed the defendant's statements following a traffic stop, canine alert, and nonconsensual patdown and search that revealed a bag containing contraband in the defendant's pocket. *See United States v. Richardson*, 700 F. Supp. 2d 1040, 1053 (N.D. Ind. 2010) (holding that "no reasonable person in [the defendant's] place would have felt

---

[8] The patdown of Defendant extended beyond a *Terry* frisk for weapons and included a search for contraband. Defendant consented, however, to Officer DeFiore reaching inside his pockets.

free to leave from the instant [the officer] pulled the drugs from [the defendant's] pocket"). The *Richardson* court emphasized that the "*Terry* stop had ended" the moment the officer removed the bag knowing it was not a weapon. *Id.* at 1052. Defendant's reliance on *Richardson* is misplaced because he was not subjected to a nonconsensual search, and at the scene of the traffic stop, no actual contraband was found on his person or in his backpack. Accordingly, unlike in *Richardson,* Defendant's subsequent arrest was not inevitable. At best, law enforcement had a reasonable belief that his backpack may contain contraband. They did not, however, arrest him on that basis. *See United States v. Hernandez*, 2007 WL 543445, at *6 (E.D. Wis. Feb. 16, 2007) (holding that a driver of a vehicle was not in "custody" during a traffic stop despite being "informed of the dog's alert").

Other factors also weigh in favor of finding Officer DeFiore's brief questioning of Defendant was not custodial in nature. Defendant was asked only a few questions[9] in a public location[10] with access to his traveling companions and passersby. *See FNU LNU*, 653 F.3d at 154 (noting that the *Miranda* "rule exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere'") (alteration in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 457 (1966)). Law enforcement had returned to Defendant the personal belongings found in his pockets.[11] Moreover, Defendant was not placed in handcuffs, "generally recognized as a hallmark of

---

[9] *See Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (considering whether the questioning was a "marathon session designed to force a confession").

[10] *See Berkemer*, 468 U.S. at 438 ("[T]he typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view . . . diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse."); *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001) (citing *Berkemer* and noting "the public nature of the scene" of a traffic stop weighs against a custodial setting).

[11] *See United States v. Tehrani*, 826 F. Supp. 789, 798-99 (D. Vt. 1993) (recognizing that "prolonged retention of a person's identification cards or other personal effects" is relevant to the custody analysis).

a formal arrest," *Newton*, 369 F.3d at 676, or other physical restraints. The officers did not draw their weapons,[12] and they did not advise Defendant that he was not free to leave or under arrest. *See United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."). Officer DeFiore did not use a threatening tone of voice when questioning Defendant. To the contrary, his initial question regarding ownership of the backpack was posed to all of the occupants of the vehicle, and Officer DeFiore and Defendant had previously spoken briefly in a joking manner.

Although a close question, Defendant has not established that his "freedom of action" was "curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. Based on the totality of the circumstances, Defendant was thus not in custody when he was questioned about the backpack and no *Miranda* warnings were required. *Berkemer*, 468 U.S. at 441-42. Defendant's motion to suppress statements is therefore DENIED.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress (Doc. 15.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 26th day of September, 2013.

Christina Reiss, Chief Judge
United States District Court

---

[12] *See FNU LNU*, 653 F.3d at 155 (noting that officers never drew their weapons when determining that suspect was not in custody); *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (finding that a suspect was not in custody even though the interrogating officers "did have (holstered) guns, which may have been visible to the defendant").